**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 13-55-DLB-CJS**

**CARL DAVID TOLLISON**                                                                 **PLAINTIFF**

**vs.**                                  **MEMORANDUM OPINION AND ORDER**

**THE CITY OF INDEPENDENCE, et al.**                                       **DEFENDANTS**

******************

## I.      Introduction

Officer Greg Hallau and Captain Anthony Lucas, both of the Independence Police Department, move for summary judgment on Carl Tollison's § 1983 false arrest and excessive force claims, arguing that: (1) Tollison's threatening behavior gave them probable cause to arrest him for second-degree disorderly conduct, third-degree terroristic threatening, menacing and resisting arrest; and (2) they appropriately used minor force to subdue a resistant Tollison.  Officer Hallau and Captain Lucas contend that summary judgment is appropriate on Tollison's state tort claims for the same reasons.  In the alternative, Officer Hallau and Captain Lucas maintain that they are entitled to qualified immunity under § 1983 and Kentucky law.

The City of Independence and the Independence Police Department seek summary judgment on Tollison's § 1983 municipal liability claim, arguing that no official policy of custom caused the constitutional deprivation.  Mayor Moriconi and Chief Shawn Butler also contend that they are entitled to summary judgment on Tollison's § 1983 supervisory

1

liability claim because they did not know of a risk created by employing Officer Hallau and Captain Lucas.  They insist that summary judgment is appropriate on Tollison's state negligent supervision, hiring and training claim for the same reason.  Alternatively, Mayor Moriconi and Chief Butler claim that they are entitled to qualified immunity under § 1983 and Kentucky law.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367.

## II.    Factual and Procedural Background

On April 7, 2012, Carl Tollison was riding his motorcycle in a funeral procession when he was involved in a minor traffic accident at the intersection of Madison Pike and Centennial Boulevard in Independence, Kentucky.  (Doc. # 38-1 at 1-5).  Officer Greg Hallau of the Independence Police Department responded to the scene.  (*Id.*).  After speaking with both motorists and an eyewitness, Officer Hallau completed a Kentucky Uniform Police Traffic Collision Report.  (*Id.*).  In the Report, he identified Tollison as "Unit 1" and reported that he "misjudged clearance." (*Id.*).  He also indicated that neither party was injured in the accident.  (*Id.*).

Tollison returned home and soon discovered a fresh bruise on his elbow.  (Doc. # 38-2 at 2-3).  He immediately contacted Officer Hallau, hoping that he would include this injury in the Report.  (*Id.*).  Officer Hallau did not answer his phone, so Tollison left a voicemail.  (*Id.*).  Later that day, Officer Hallau used a different phone number to return the call, but Tollison decided not to pick up because he did not recognize the number.  (*Id.* at 1).  Tollison later tried to redial that number, but it was restricted.  (*Id.* at 2).

On April 12, 2012, Tollison went to the Independence Police Department ("IPD") and asked receptionists Nancy Slusher and Catherine Weger for a copy of the Report.  (Doc.

2

# 47-3 at 1).  As Slusher and Weger searched for the appropriate document, with help from IPD volunteer Phyllis Vetter, Tollison described the traffic accident and repeatedly referred to Officer Hallau as a "prick."  (Doc. # 55 at 4).  Once the receptionists located the Report, they made Tollison a copy to review.  (*Id.*).  He stood in the lobby while he read over it, then returned to the reception desk and began expressing his dissatisfaction with it.  (*Id.*).

Slusher escorted Tollison to the Soft Interview Room, then went into the secure IPD office space.  (*Id.*).  She informed Officer Hallau that Tollison had some concerns about the Report and wanted to speak with him.  (*Id.*).  She also warned Officer Hallau that Tollison seemed angry.  (*Id.* at 5).  As Officer Hallau headed towards the door connecting the office space to the Soft Interview Room, he passed Captain Lucas and told him "this isn't going to be good."  (Doc. # 53 at 19 and 57 at 5).

Upon entering the Soft Interview Room, Officer Hallau asked Tollison how he could help him.  (Doc. # 38-2 at 1).  Tollison explained that he wanted Officer Hallau to document his elbow injury in the Report for his insurer's benefit.  (*Id.* at 1-2).  Officer Hallau refused to do so because several days had passed since the accident.  (*Id.*).  Tollison pointed out that he had tried to contact Officer Hallau a few hours afterwards, but Officer Hallau cut him off, saying that he would not argue with Tollison.  (*Id.* at 3).  The conversation then became heated.  The Soft Interview Room video captured the following exchange:

| Officer Hallau: | I'm not arguing with you. |
| Tollison: | Why are you such a jerk? |
| Officer Hallau: | Wait a minute. You're not going to talk to me like that. |
| | Leave or I will arrest you on the spot. |
| Tollison: | Or what? |

3

| Officer Hallau: | Leave.  Disorderly conduct, trespassing, obstruction of |
| | official business.  Leave. |
| Tollison: | This is official business. |

(*Id.* at 3-4).

At this point, Tollison began backing out of the Soft Interview Room and into the

lobby.[1]  (Doc. # 39).  Officer Hallau followed him and the two men continued to shout at

each other:

| Tollison: | One of these days, Jack. |
| Officer Hallau: | Leave. |
| Tollison: | One of these days, me and you. |
| Officer Hallau: | Are you threatening me? |
| Tollison: | No. |
| Officer Hallau: | Are you threatening me?  (Inaudible).  I'm talking to you. |
| | Turn around right now.  Turn around right now. |
| Female Speaker: | Stop, Greg. |
| Officer Hallau: | What's going on, man? |
| Tollison: | I know you're a jerk. |
| Officer Hallau: | You're under arrest. |
| Female Speaker: | (Inaudible).  Hurry up.  (Inaudible conversation). |
| Officer Hallau: | You're under arrest. |

---

1) The Soft Interview Room camera recorded their entire verbal altercation from start to finish.  (Doc. # 39).
However, as Tollison and Officer Hallau moved out of the Soft Interview Room, their physical movements are
only visible on the lobby surveillance camera, which does not have audio recording capabilities.  (*Id.*).  Thus,
one must compare the audio from the last half of the Soft Interview Room recording with the silent surveillance
video in order to understand what happened in the lobby.  (*Id.*).

4

(Inaudible conversation)

(Doc. # 38-2 at 4).  During this part of the exchange, Tollison was moving towards the front door, as if to leave.  (Doc. # 39).  He then strode back towards Officer Hallau, getting relatively close to him.  (*Id.*).  This prompted Officer Hallau to place him under arrest.  (*Id.*).

Vetter could see the dispute developing from her post at the reception desk.  (Doc. # 56 at 8).  She called back to Slusher and Weger, who remained in the secure IPD office space, and told them to get help.  (Docs. # 57 at 6 and 56 at 8).  They immediately ran through the office and alerted Chief Butler to the incident.  (Doc. # 57 at 6).  Meanwhile, Captain Lucas overheard the raised voices and ran into the lobby to assist Officer Hallau. (Doc. # 54 at 15-16).

As Officer Hallau grabbed Tollison's arm and attempted to place him in handcuffs, Captain Lucas came forward to assist in the arrest.  (Doc. # 39).  All three men lost their balance and fell to the floor.  (*Id.*).  Tollison fell partially on top of Officer Hallau, while Captain Lucas was dragged to his knees.  (*Id.*).  Officer Hallau testified that Tollison resisted arrest, while Tollison insisted that he was tripped.  (Docs. # 51 at 26; 53 at 22-23). Once they had subdued Tollison, Officer Hallau and Captain Lucas stood up, handcuffed him and helped him to his feet.  (Docs. # 39; 53 at 23).

Chief Butler arrived on scene just as Officer Hallau and Captain Lucas completed the arrest.  (Doc. # 52 at 12).  He made sure that everyone was alright, then pulled a cruiser to the front door so that Officer Hallau could escort Tollison to jail.  (Doc. # 54 at 16).  Officer Hallau also breathalyzed Tollison, even though Tollison repeatedly assured him that he did not drink.  (Doc. # 53 at 24).  Captain Lucas testified that he instructed Officer Hallau to breathalyze Tollison because he thought he could smell alcohol on his

5

person; however, Tollison insists that Chief Butler ordered the breathalyzer test.  (Docs. # 54 at 13 and 51 at 29).  Officer Hallau then transported Tollison to the Kenton County Detention Center.  (Doc. # 53 at 24-25).

Tollison was ultimately charged with second degree disorderly conduct, third-degree terroristic threatening, menacing and resisting arrest.  (Doc. # 38-3).  On September 27, 2012, Assistant Kenton County Attorney Jonathan Hart moved to dismiss these charges during a hearing in Kenton County District Court.  (Doc. # 40).  He explained that he was not conceding a lack of probable cause to prosecute Tollison; rather, he believed that it was appropriate to dismiss the charges, given Tollison's past military service and clean criminal record.  (*Id.*).

Tollison sued the City, IPD, Mayor Chris Moriconi, Chief Butler, Captain Lucas and Officer Hallau (collectively, "the Independence Defendants") for false arrest, unlawful confinement, excessive force, conspiracy and failure to prevent harm in violation of 42 U.S.C. § 1983.  (Doc. # 23).  He also asserted pendent state claims for assault, battery, false imprisonment, malicious prosecution, abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, gross negligence and negligent supervision.  (*Id.*).  Discovery is now closed (Docs. # 32 and 33), and the Independence Defendants' Motion for Summary Judgment is ripe for review (Docs. # 38, 46 and 50).

## III.   Analysis

### a.   *Standard of Review*

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

### b.      Claims Under 42 U.S.C. § 1983

Section 1983, Title 42, United States Code aims to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  *Wyatt v. Cole*, 504 U.S. 158, 161 (1992); *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (stating that the statute "is not itself a source of substantive rights, but merely provides a method or vindicating federal rights elsewhere conferred").  It provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

To prevail on a § 1983 claim, a plaintiff must generally demonstrate that: (1) he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) the

deprivation was caused by a person acting under color of state law.  *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003).

Tollison claims that Officer Hallau and Captain Lucas violated his right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments in two respects.  First, Tollison argues that Officer Hallau and Captain Lucas lacked probable cause to arrest him.  He then asserts that they used excessive force in effectuating that arrest.  Tollison also contends that Chief Butler, Mayor Moriconi, the City and IPD are liable under § 1983 for failing to properly instruct, supervise, control and discipline Officer Hallau and Captain Lucas.  The Court will consider each of these allegations in turn.

### 1.   False Arrest Claim Against Officer Hallau and Captain Lucas[2]

The Fourth Amendment provides that:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment."  *Ingram v. City of Columbus*, 185 F.3d 579, 592-93 (6th Cir. 1999) (internal citation omitted).  Accordingly, a plaintiff must "prove that the arresting officer lacked probable cause to

---

2) Tollison also brings a § 1983 unlawful detention and confinement claim.  (Doc. # 23 at 13-14).  The Independence Defendants argue that this claim should be dismissed as duplicative of the § 1983 false arrest claim because "there is no proof that any of the Defendants did anything to perpetuate or prolong the prosecution against Tollison following his arrest."  (Doc. # 38 at 8, n. 43).  Tollison offers no response to this argument.  The Court therefore finds it appropriate to dismiss the § 1983 unlawful detention and confinement claim is appropriate.

arrest" him or her in order to succeed on a false arrest claim under § 1983.  *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005).

Probable cause exists if there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense."  *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  Simply stated, "[p]robable cause requires only the *probability* of criminal activity not some type of 'prima facie' showing."  *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (emphasis added); *see also Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003) (noting that reasonableness is "based on an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest.*").  Whether probable cause existed to arrest the plaintiff is a question "left for the jury, unless there is only one reasonable determination possible."  *Criss*, 867 F.2d at 262.

If the plaintiff was charged with multiple offenses, his or her claim will not survive unless probable cause is lacking as to *all* of the charges.  *See Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003) (finding that defendant police officers did not violate plaintiff's Fourth Amendment rights, even though they lacked probable cause to arrest him for evading arrest, because there was probable cause to arrest him for drug possession); *Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005) ("To the extent probable cause exists for any one of these charges, the arrest was lawful and our analysis is complete.").

In the instant case, Officer Hallau charged Tollison with four misdemeanor offenses: (1) second-degree disorderly conduct; (2) third-degree terroristic threatening; (3) menacing; and (4) resisting arrest.  (Doc. # 38-3).  The Court must therefore consider whether Officer

9

Hallau had probable cause to arrest Tollison for *any* of these offenses, based upon his behavior at IPD on April 12, 2012.

KRS § 525.060 defines disorderly conduct in the second degree as follows:

1.    A person is guilty of disorderly conduct in the second degree when in a public place and with intent to cause public inconvenience, annoyance, or alarm, or wantonly creating a risk thereof, he:

  a.    Engages in fighting or in violent, tumultuous, or threatening behavior;

  b.    Makes unreasonable noise;

  c.    Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard, or other emergency; or

  d.    Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.

Officer Hallau and Captain Lucas maintain that there was probable cause to arrest Tollison for second-degree disorderly conduct because he engaged in threatening behavior and made unreasonable noise in a public place.  After Officer Hallau refused to amend the accident report, Tollison exclaimed "Why are you such a jerk?" thus sparking a heated verbal altercation between the two men.  (Doc. # 38-2 at 3).  Officer Hallau repeatedly yelled "Leave" at Tollison while following him out of the Soft Interview Room into the IPD lobby.  (*Id.* at 4).  As Tollison walked towards the exit, he shouted "One of these days, you and me, Jack," at Officer Hallau, who interpreted this statement as a threat.  (*Id.*).  Their exchange was so loud that it caused Captain Lucas to run to Officer Hallau's aid, while desk clerks Catherine Weger and Nancy Slusher abandoned their work stations and ran to inform Chief Butler of the disturbance.  (Docs. # 54 at 15-16; 56 at 8; 57 at 6).

10

Tollison maintains that his statement should not be construed as a threat because he did not clearly evince an intent to harm Officer Hallau. In fact, when Officer Hallau asked Tollison if he was threatening him, Tollison answered "No, I'm talking to you." (Docs. # 39; 38-2 at 4). Tollison also insists that he did not move towards Officer Hallau in a threatening manner or touch him. Tollison finally claims that Officer Hallau was the cause of the unreasonable noise because he continued to shout at Tollison as he walked towards the exit.

Having reviewed the surveillance footage from the Soft Interview Room and the IPD lobby several times, the Court finds that reasonable minds could differ as to whether the facts and circumstances within Officer Hallau and Captain Lucas' knowledge were sufficient to warrant a prudent person in believing that Tollison had committed or was about to commit second-degree disorderly conduct. On the one hand, Officer Hallau testified that he interpreted Tollison's statement as a threat towards him. (Doc. # 53 at 22). On the other hand, Tollison did not explicitly express an intent to harm Officer Hallau; rather, he denied making any threats. (*Id.*). As for the unreasonable noise, both men can be heard shouting on the video. (Doc. # 39). Tollison may have been the first to raise his voice in the Soft Interview Room, but Officer Hallau followed Tollison into the lobby and shouted at him as he walked towards the exit. (*Id.*). Because there is more than one reasonable determination possible on this probable cause inquiry, the Court must reserve it for the jury.

KRS § 508.080 proscribes terroristic threatening in the third degree:

1. Except as provided in 508.075 and 508.078, a person is guilty of terroristic threatening in the third degree when:

   a. He threatens to commit any crime likely to result in death or serious physical injury to another person or likely to result in substantial property damage to another person; or

11

b.    He intentionally makes false statements for the purpose of causing evacuation of a building, place of assembly, or facility of public transportation.

KRS § 508.050 defines menacing as follows:

1.    A person is guilty of menacing when he intentionally places another person in reasonable apprehension of imminent physical injury.

Officer Hallau and Captain Lucas maintain that there probable cause to arrest Tollison for third-degree terroristic threatening and menacing.  Specifically, they claim that Tollison threatened to commit a crime likely to result in serious physical injury, or at least placed Officer Hallau in reasonable apprehension of imminent physical injury, by shouting "One of these days, you and me, Jack."  As the Court has already noted, some of the alleged facts suggest that Tollison's statement could constitute a threat, while others cast doubt on such a conclusion.  Therefore, reasonable minds could differ as to whether reasonable officials in their position would have believed that Tollison was committing third-degree terroristic threatening and/or menacing.  The Court must also reserve these probable cause determinations for the jury.

KRS § 520.090 proscribes resisting arrest:

1.    A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a peace officer, recognized to be acting under color of his official authority, from effecting an arrest of the actor or another by:

a.    Using or threatening to use physical force or violence against the peace officer or another; or

b.    Using any other means creating a substantial risk of causing physical injury to the peace officer or another.

12

Officer Hallau insists that Tollison pulled away as he tried to handcuff him.  (Doc. # 53 at 22-23).  Phyllis Vetter testified similarly.  (Doc. # 56 at 7).  By contrast, Tollison asserts that Officer Hallau and Captain Lucas swept him to the ground, even though he was not struggling.  (Doc. # 51 at 26).  Captain Lucas, who assisted Officer Hallau in making the arrest, could not say for sure whether Tollison actually pulled away from them or whether all three men simply lost their balance and fell.  (Doc. # 54 at 15).

The lobby video shows Officer Hallau grabbing Tollison's arm as Captain Lucas runs to assist him.  (Doc. # 39).  One can see the three men stumble, then fall to the ground. (*Id.*).  Tollison lands partially on top of Officer Hallau, dragging Captain Lucas to his knees. (*Id.*).  However, it is not clear whether the fall was caused by Tollison's resistance, the use of force by Officer Hallau and Captain Lucas or a mere loss of balance.  In light of the conflicting witness testimony and the inconclusive nature of the lobby video, the Court again finds that reasonable minds could differ as to whether a reasonable official in Officer Hallau's position would have believed that Tollison was resisting arrest.

Because there is more than one reasonable conclusion as to probable cause for all four charged offenses, the Court finds that there is a genuine issue of material fact as to whether Officer Hallau and Captain Lucas violated Tollison's right to be free from false arrest.  The question now becomes whether or not they are entitled to qualified immunity.

### 2.    Qualified Immunity on the False Arrest Claim

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted).  Courts utilize a two-part

test to determine whether a government official is entitled to qualified immunity.  *Pearson*,

555 U.S. at 815-16 (citing *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)).  First, courts ask

whether "the facts alleged show the officer's conduct violated a constitutional right."

*Saucier*, 533 U.S. at 201.  Once plaintiffs demonstrate that a constitutional violation

occurred, courts must then determine "whether the right was clearly established . . . in light

of the specific context of the case, not as a broad general proposition."  *Id.*

This second prong "requires the court[ ] to examine the asserted right at a relatively

high level of specificity, and on a fact-specific, case-by-case basis."  *Bletz v. Gribble*, 641

F.3d 743, 750 (6th Cir. 2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

> The contours of the right must be sufficiently clear that a reasonable official
> would understand that what he is doing violates that right.  This is not to say
> that an official action is protected by qualified immunity unless the very action
> in question has previously been held unlawful, but it is to say that in the light
> of pre-existing law the unlawfulness must be apparent.

Pre-existing law includes "binding precedent from the Supreme Court, the Sixth Circuit, the

district court itself, or other circuits that is directly on point."  *Holzemer*, 621 F.3d 512, 527

(6th Cir. 2010); *see also Kennedy v. City of Villa Hills*, 635 F.3d 210, 215 (6th Cir. 2011)

(explaining that "state law defines the offense for which an officer may arrest a person,

while federal law dictates whether probable cause existed for an arrest").

In the previous section, the Court found that there was a genuine issue of material

fact as to whether Officer Hallau and Captain Lucas violated Tollison's right to be free from

unlawful arrest.  Nevertheless, they contend that they are entitled to qualified immunity

because Tollison has not pointed to any case law clearly establishing that his arrest lacked

probable cause.  Tollison insists that they are not entitled to qualified immunity because he

had a clearly established right to be free from arrest without probable cause.  The Court will

14

address these arguments, as they pertain to each Defendant.

### a.    Officer Hallau

Federal courts sitting in Kentucky have found that probable cause existed to arrest plaintiffs for menacing when they committed "overt physical acts of aggression directed toward another person." *Martin v. Coyt*, No. 1:10-CV-00176-R, 2012 WL 1574823, at *10 (W.D. Ky. May 3, 2012) (collecting cases).  In some cases, "verbal threats alone may compose the underpinning for probable cause to arrest." *Id.*  These principles have been applied in cases where an arrestee threatened police officers. *See Hatter v. Livingood*, Civ. A. No. 5:07-2-JMH, 2008 WL 2228878, at * (E.D. Ky. May 29, 2008) (finding that police officers had probable cause to arrest a plaintiff for menacing when he grabbed their badges and fought with them); *Fultz v. Whittaker*, 187 F. Supp.2d 695, 702-03 (W.D. Ky. 2001) (concluding that police officers had probable cause to arrest a plaintiff where he came very close to them, assumed an aggressive posture and was yelling).

However, case law suggests that there is a distinction to be made between threats and mere coarse language or criticism. *Kennedy v. City of Villa Hills*, 635 F.3d at 215 (quoting *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism a certain amount of verbal criticism and challenge directed at police officers.")); *see also Payne v. Pauley*, 337 F.3d 767, 777 (7th Cir. 2003) (noting that "[p]olice officers must be more thick skinned than the ordinary citizen . . . and must not conceive that every threatening or insulting word, gesture, or motion amounts to disorderly conduct").

Having considered the above-cited case law, the question before the Court is this: Could a reasonable policeman in Officer Hallau's position reasonably believe that he had

15

probable cause to arrest Tollison for second-degree disorderly conduct, third-degree terroristic threatening or menacing based on his alleged threat?  The case law certainly *suggests* that individuals may have a right to be free from arrest based on mere offensive remarks directed at police officers.  However, it falls far short of clearly establishing such a right under these circumstances.  *Compare Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 96-97 (6th Cir. 2012) (explicitly stating that "the right to be free from physical force when one is not resisting the police *is a clearly established right*").  Under these circumstances, the Court finds that Officer Hallau could reasonably believe that he had probable cause to arrest Tollison for second-degree disorderly conduct based on threatening behavior, third-degree terroristic threatening and menacing.

The case law is similarly unsettled as to the propriety of Tollison's arrest for second-degree disorderly conduct based on unreasonable noise.  *See Nails v. Riggs*, 195 F. App'x 303, 311 (6th Cir. 2006) (noting that Kentucky case law on the disorderly conduct statutes was sparse).  The Sixth Circuit has held that a police officer could not reasonably believe that probable cause existed to arrest a plaintiff for second-degree disorderly conduct based on unreasonable noise when "only city employees heard [plaintiff] speak and the city building was not 'open for business' at the time," reasoning that these circumstances "minimize[d] any risk of public alarm."  *Kennedy*, 635 F.3d at 215-16 (6th Cir. 2011) (noting that "Kentucky law does not criminalize arguments and noise that disturb only police officers because such conduct does not risk *public* alarm").  *Accord* Ky. Rev. Stat. Ann. § 525.060 cmt. ("The statute is not intended to cover the situation in which a private citizen engages in argument with the police *so long as the argument proceeds without offensively coarse language or conduct which intentionally or wantonly creates a risk of public*

16

*disturbance.*") (emphasis added).

Although the altercation between Officer Hallau and Tollison took place at IPD and in front of IPD employees only, the Court does not believe that *Kennedy* disposes of the qualified immunity issue.  Offices for the City and IPD are located in the same building and share a lobby area, which is exactly where the dispute occurred.  (Doc. # at 12).  Although the exact timing of the incident is unknown, deposition testimony suggests that it was somewhere between 11 a.m. and 1 p.m.  (Docs. # 51 at 21 and 55 at 4).  Thus, both offices were open for business.  An unsuspecting citizen could have walked in at any moment and happened upon this altercation, which would no doubt cause public alarm.  In this particular situation, the Court concludes that Officer Hallau reasonably believed that he had probable cause to arrest Tollison for second-degree disorderly conduct based on unreasonable noise.

Because Officer Hallau's conduct did not violate clearly established statutory or constitutional rights of which a reasonable policeman would have known, the Court concludes that he is entitled to qualified immunity on the § 1983 false arrest claim.

### b.    Captain Lucas

When an officer simply assists in an arrest, they are entitled to rely on the arresting officer's determination of probable cause.  *Ghaith v. Rauschenberger*, 778 F. Supp. 2d 787, 801 (E.D. Mich. 2011).  He is "not required to conduct an independent investigation to personally satisfy [himself] that probable cause existed to make the arrest."  *Id.* at 801-02 (citing *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985) (referring to this principle as the "fellow officer" rule)).

17

Officer Hallau, Captain Lucas and Tollison all testified that Captain Lucas reached the lobby just as Officer Hallau was attempting to handcuff Tollison. (Docs. # 51 at 26; 53 at 23; 54 at 14-15). He did not hear the alleged threat that led to the second-degree disorderly conduct, third-degree terroristic threatening and menacing charges. He simply assisted Officer Hallau in making the arrest, and in doing so, he permissibly relied upon his fellow officer's probable cause determination. Accordingly, the Court concludes that Captain Lucas reasonably believed there was probable cause to arrest Tollison. He is therefore entitled to qualified immunity on the § 1983 false arrest claim.

### 3.   Excessive Force Claim Against Officer Hallau and Captain Lucas

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotations omitted). The key inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (noting further that "police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation").

The Sixth Circuit has held that police officers do not violate the Fourth Amendment by using force to subdue an actively resisting subject. *See, e.g., Caie v. West Bloomfield Twp.*, 485 F. App'x at 96-97 (finding that an officer's single use of a taser "served the

18

purpose of gaining control over a highly intoxicated, volatile, and uncooperative subject"
who pulled his arms underneath his body after being taken to the ground, thus preventing
officers from handcuffing him).  However, the Sixth Circuit has found force to be excessive
when applied to a subject who is either cooperative or no longer resisting arrest.  *See, e.g.,
Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010) (finding that officers violated
the Fourth Amendment by dragging a non-resistant subject from his truck and tasing him).

Officer Hallau and Captain Lucas maintain that they appropriately used minor force
to restrain Tollison, who allegedly threatened Officer Hallau and ignored repeated orders
to leave the station.  Tollison denies threatening Officer Hallau; in fact, he was attempting
to leave the station as Officer Hallau shouted across the lobby at him.  He also claims that
Officer Hallau and Captain Lucas swept him to the ground, even though he did not resist
arrest.

As the Court has already explained, reasonable minds could differ as to whether
Officer Hallau had probable cause to arrest Tollison for threatening behavior and resisting
arrest.  These factors directly impact the objective reasonableness of the force used to
effectuate the arrest.  *See Graham*, 490 U.S. at 397 (directing courts to consider "the
severity of the crime at issue, whether the subject poses an immediate threat to the safety
of the officers or others, and whether he is actively resisting arrest or attempting to evade
arrest by flight").  Thus, the Court finds that there is a genuine issue of material fact as to
whether the force used on Tollison was objectively reasonable under the circumstances.
The Court must now consider whether Officer Hallau and Captain Lucas are entitled to
qualified immunity.

19

### 4.    Qualified Immunity for the Excessive Force Claim

As noted in the previous section, the Sixth Circuit has repeatedly held that police officers may use force to subdue an actively resisting suspect without running afoul of the Fourth Amendment.  However, that force becomes excessive when applied to a subject who is either no longer resisting or cooperative.  *See, e.g., Caie v. West Bloomfield Twp.*, 485 F. App'x at 96-97.  "[T]he right to be free from physical force when one is not resisting the police *is a clearly established right.*"  *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010) (emphasis added) (quoting *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008)).

If Officer Hallau and Captain Lucas applied minor force to subdue a resistant Tollison, then it is likely that a constitutional violation did not occur.  On the other hand, if Officer Hallau and Captain Lucas applied minor force to a compliant Tollison, then it is likely that they violated a clearly established constitutional right.  However, the Court cannot make this determination without deciding whether or not Tollison resisted arrest, which is a question reserved for the jury.  In such situations, the Court must deny summary judgment on qualified immunity grounds.  *See Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988) (stating that summary judgment is inappropriate "if there is a factual dispute . . . involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights").  Thus, Officer Hallau and Captain Lucas are not entitled to qualified immunity on Tollison's § 1983 excessive force claim.

20

### 5.     Supervisory Liability Against Chief Butler and Mayor Moriconi

#### *a.     Chief Shawn Butler*

Liability under § 1983 "must be based on more than respondeat superior, or the right to control employees."  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  Therefore, "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'"  *Id.* (quoting *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)).  "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Hays*, 668 F.2d at 874.

Chief Butler argues that he is entitled to summary judgment on the § 1983 supervisory liability claim because he did not directly participate in Tollison's arrest.  He reached the lobby just as Officer Hallau and Captain Lucas handcuffed Tollison.  (Doc. # 52 at 12).  After making sure that everyone was alright, he pulled Officer Hallau's cruiser around to the front entrance so he could escort Tollison to jail.  (Doc. # 54 at 16).  Although Captain Lucas testified that he instructed Officer Hallau to administer a breathalyzer test, Tollison claims that Chief Butler was actually the one who ordered the test.  (Doc. # 51 at 29).  For this reason, Tollison claims that Chief Butler was complicit in the alleged constitutional violations.

Assuming, without deciding, that Tollison's recollection is accurate, the use of a breathalyzer is not relevant to the § 1983 false arrest and excessive force claims.  Tollison does not allege that he was arrested on a bogus public intoxication charge, nor does he suggest that administration of a breathalyzer test constituted excessive force.  Thus, the

21

act of ordering the test does not establish that Chief Butler authorized, approved or knowingly acquiesced to the alleged false arrest and use of excessive force.  The fact that Chief Butler parked Officer Hallau's cruiser in front of IPD is similarly insufficient to show that he encouraged or otherwise participated in the arrest.  Because Tollison has failed to identify a genuine issue of material fact as to Chief Butler's direct involvement in or approval of the alleged constitutional violations, the Court concludes that Chief Butler is entitled to summary judgment on the § 1983 supervisory liability claim.

### b.   Mayor Chris Moriconi

Mayor Moriconi argues that he is entitled to summary judgment on the § 1983 supervisory liability claim because he had no involvement in Tollison's arrest.  He did not even witness the altercation between Tollison and Officer Hallau.  There is also no evidence in the record to suggest that he otherwise encouraged or authorized police officers to violate constitutional rights.  Tollison makes no attempt to defend this claim. Having reviewed the record, and found no genuine issues of material fact on this point, the Court concurs with Mayor Moriconi.  He is therefore entitled to summary judgment on the § 1983 supervisory liability claim.

### 6.   Municipal Liability Against the City of Independence[3]

---

3) Tollison technically brings this § 1983 municipal liability claim against IPD as well as the City.  (Doc. # 23 at 17-18).  However, IPD is not an entity capable of suing and being sued.  *See Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (stating in the § 1983 context that a local police department was not an entity which could be sued); *Rodgers v. City of Cleveland*, No. 1:05-CV-2349, 2006 WL 2371981, at *1, n. 1 (N.D. Ohio Aug. 15, 2006) (applying this principle in the Title VII context); *Jones v. Marcum*, 197 F. Supp. 2d 991, 997 (S.D. Ohio 2002) ("Police departments are not *sui juris*; they are merely sub-units of the municipalities they serve.").  Accordingly, this claim against IPD cannot proceed.  The Court has limited its analysis to the municipal liability claim against the City itself.

Tollison also asserts a § 1983 conspiracy claim against the Independence Defendants.  (Doc. # 23 at 15-16).  To prevail on such a claim, a plaintiff must establish that: (1) a single plan existed; (2) the conspirators shared a general conspiratorial objective to deprive the plaintiff of a constitutional right; and (3) an overt act was committed.  *Monroe v. McNairy Cnty., Tenn.*, 850 F. Supp. 2d 848, 871 (W.D. Tenn. 2012) (citing *Revis*

Liability under § 1983 "may not [be] imposed upon a municipality merely because it employed an individual who engaged in some form of unconstitutional conduct." *Monistere v. City of Memphis*, 115 F. App'x 845, 850 (6th Cir. 2004) (citing *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978)).  Rather, "[i]it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Monell*, 436 U.S. at 694.

> A "custom" for purposes of *Monell* liability must "be so permanent and well settled as to constitute a custom or usage with the force of law." . . . In turn, the notion of "law" must include "[d]eeply embedded traditional ways of carrying out state policy." . . . It must reflect a course of action deliberately chosen from among various alternatives.  In short, a "custom" is a "legal institution" not memorialized by written law . . .

*Monistere*, 115 F. App'x at 850-51 (quoting *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 507-08 (6th Cir. 1996)).

The City insists that it is entitled to summary judgment on the § 1983 municipal liability claim because Tollison has failed to produce evidence of a City policy or custom that caused the alleged constitutional deprivation.  Tollison makes no attempt to defend this claim.  Having reviewed the record, and found no genuine issues of material fact on this point, the Court concludes that the City is entitled to summary judgment on the § 1983 municipal liability claim.

### c.    *Claims Under Kentucky Law*

#### 1.    Assault and Battery Claims Against Officer Hallau and Captain Lucas

---

*v. Meldrum,* 489 F.3d 273, 290 (6th Cir. 2007)).  As the Court makes clear in its analysis of the other § 1983 claims, there is simply no evidence of a conspiratorial objective to deprive Tollison of his right to be free from unlawful arrest and excessive force.  Defendants are entitled to summary judgment on this claim.

"Assault is a tort which merely requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching." *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001). However, Kentucky law partially shields police officers from liability for such torts. KRS § 503.090 provides in pertinent part:

> (1)   The use of physical force by a defendant upon another person is justifiable when the defendant, acting under official authority, is making or assisting in making an arrest, and he:
>
> > (a)   Believes that such force is necessary to effect the arrest;
> >
> > (b)   Makes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and
> >
> > (c)   Believes the arrest to be lawful.

Stated simply, "[t]he use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person." *Fultz v. Whittaker*, 261 F. Supp. 2d 767, 783 (W.D. Ky. 2003).

Officer Hallau and Captain Lucas argue that they cannot be held liable for assault and battery because they were "privileged to use reasonable force in effectuating an arrest pursuant to KRS § 503.090." (Doc. # 38 at 19). Tollison insists that the privilege does not apply to Officer Hallau and Captain Lucas because they "did not have reasonable grounds for the arrest and ultimately used more force than was necessary to effect that arrest." (Doc. # 46 at 28). As the case law above states, whether Officer Hallau and Captain Lucas are protected by KRS § 503.090 depends upon whether their use of force was reasonable. This is precisely the same question that lies at the heart of Tollison's § 1983 excessive

24

force claim. As the Court noted in analyzing that claim, reasonable minds could reach different conclusions on the issue of reasonable force. Thus, the Court concludes that there is a genuine issue of material fact as to whether the force used on Tollison was objectively reasonable under the circumstances. Officer Hallau and Captain Lucas are not entitled to summary judgment on the assault claim.

### 2. False Imprisonment Claim Against Officer Hallau and Captain Lucas

"Kentucky cases define false imprisonment as being any deprivation of the liberty of one person by another or detention for however short a time without such person's consent and against his will, whether done by actual violence, threats or otherwise." *Banks*, 39 S.W.3d at 479. "[T]he restraint must be wrongful, improper, or without a claim or reasonable justification, authority or privilege." *Id.*

Officer Hallau and Captain Lucas contend that they are entitled to summary judgment on this claim because they had probable cause to arrest Tollison for one or more of the charged offenses. Tollison opposes summary judgment, arguing that Officer Hallau and Captain Lucas did not have probable cause to arrest Tollison. Much like the assault and battery claims, this claim also turns upon an issue addressed by the Court in the context of the § 1983 false arrest claim, i.e., whether Tollison's arrest was supported by probable cause. In analyzing that claim, the Court found that reasonable minds could reach different conclusions on the question of probable cause. Thus, because there is a genuine issue of material fact as to whether the force used on Tollison was objectively reasonable under the circumstances, the Court must deny summary judgment on this claim.

### 3. Malicious Prosecution Claim Against Officer Hallau and Captain Lucas

There are six elements necessary to the maintenance of an action for malicious prosecution: (1) the institution or continuation of original judicial proceedings, either civil or criminal, or of administrative or disciplinary proceedings; (2) by, or at the instance, of the plaintiff; (3) the termination of such proceedings in defendant's favor; (4) malice in the institution of such proceeding; (5) want or lack of probable cause for the proceeding; and (6) the suffering of damage as a result of the proceeding. *Raine v. Drasin*, 621 S.W.2d 895, 899 (Ky. 1981).

A termination in favor of the accused requires more than just that the party prevailed in the underlying action. *See Davidson v. Caster-Knott Dry Goods Co.*, 202 S.W.3d 597, 605 (Ky. Ct. App. 2006). "The termination must go to the merits of the accused's professed innocence for the dismissal to be 'favorable' to him." *Ohnemus v. Thompson*, 594 F. App'x 864, 867 (6th Cir. 2014). "[D]ismissal of a suit for technical or procedural reasons that do not reflect on the merits of the case is not a favorable termination of the action." *Id.; see also Alcorn v. Gordon*, 762 S.W.2d 809, 812 (Ky. Ct. App. 1988) (finding that a dismissal on statute of limitations grounds was not a termination in favor of plaintiff). Similarly, "the dismissal must be one-sided and not the result of any settlement or compromise." *Id.*

Officer Hallau and Captain Lucas argue that they are entitled to summary judgment on Tollison's malicious prosecution claim because the Kenton County District Court proceedings did not terminate in his favor. Rather, the court followed the recommendation of Kenton County Attorney Johnathan Hart, who felt that dismissal was appropriate based on Tollison's lack of criminal history and military service record. (Doc. # 40). Tollison

argues that the prosecutor's explanation was nothing but "a post hoc justification for flimsy, unsupportable charges," as evidenced by the fact that his case was dismissed *with prejudice.* (Doc. # 46 at 30).

According to the video of the Kenton County District Court proceedings, Tollison's case was not dismissed for procedural reasons, such as a statute of limitations bar. There is no evidence to suggest that the parties entered into any formal compromise, such as a plea agreement, culminating in dismissal. However, these facts do not automatically lead to the conclusion that the termination of these proceedings went to the merits of Tollison's professed innocence. Rather, it seems that Hart exercised his prosecutorial discretion in opting not to pursue this matter further. The Court simply cannot infer that Hart's decision was based on his assessment of the merits of this case. Similarly, the judge's decision to accept Hart's recommendation cannot be construed as a comment on the merits of this case. Thus, the dismissal with prejudice simply does not qualify as a termination in Tollison's favor under Kentucky law. Officer Hallau and Captain Lucas are entitled to summary judgment on this claim.

### 4. Abuse of Process Claim Against Officer Hallau and Captain Lucas

"[W]hile an action for malicious prosecution consists in maliciously causing process to be issued, [ ] an abuse of process is the employment of legal process for some other purpose other than that which it was intended by law to effect." *Raine*, 621 S.W.2d at 902. "The cause of action for abuse of process has been defined as 'the technical designation of the irregular or wrongful employment of a judicial proceeding.'" *Id.*; *see also Kinslow v. Fifth Third Bank, Inc.*, Civ. A. No. 1:12-CV-74-JHM, 2012 WL 3637483 at *2 (W.D. Ky. Aug.

22, 2012) (stating that there must be "some form of coercion to obtain a collateral advantage which is not properly involved in the proceeding itself"). *Id.* "There is no liability for abuse of process where the defendant, even though harboring bad intentions, has done nothing other than carry out the process to its authorized conclusions."

Officer Hallau and Captain Lucas move for summary judgment on Tollison's abuse of process claim, reasoning that there is no evidence of an ulterior motive for their conduct; they maintain that they did nothing more than carry the process to its authorized conclusion.   Tollison asserts that Officer Hallau, aided by Captain Lucas, used the proceedings to punish him for using coarse language and chill his constitutionally protected speech.

While Officer Hallau may have disliked Tollison's language, there is no evidence in the record to suggest that he or Captain Lucas used the legal process to avenge a personal insult.   In fact, the record reflects that Officer Hallau and Captain Lucas had very little involvement in the proceedings.   They spoke to Johnathan Hart once about the status of the case and never testified in Kenton County District Court.   (Docs. # 53 at 26-27; 54 at 18).   Tollison simply has not demonstrated that Officer Hallau and Captain Lucas did anything more than carry out the process to its logical conclusion.   Thus, the Court finds that Officer Hallau and Captain Lucas are entitled to summary judgment on this claim.

### 5.   Intentional Infliction of Emotional Distress Claim Against Officer Hallau and Captain Lucas

Under Kentucky law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

*See* Restatement (Second) of Torts § 46.  Outrageous conduct "is a deviation from all reasonable bounds of decency and is utterly intolerable in a civilized community." *Craft v. Rice*, 671 S.W.2d 247, 250-51 (Ky. 1984) (finding that the tortfeasor's conduct was outrageous where he kept a woman under surveillance, told her on CB radio that her husband would be put in jail and drove so as to force her into an opposing lane of traffic).

Kentucky courts often characterize IIED as a gap-filler tort.  *See, e.g., Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993) ("[W]here an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie.").  Although it can also be "a stand-alone tort under the right facts," the Kentucky Supreme Court has stated that "there can be only one recovery on a given set of facts." *Childers v. Geile*, 367 S.W.3d 576, 582 (Ky. 2012) (acknowledging that IIED may be pleaded in the alternative).

Officer Hallau and Captain Lucas argue that Tollison cannot use this "gap-filler" tort because it is based upon the same alleged conduct that forms the basis for his assault, battery, false imprisonment, malicious prosecution and abuse of process claims. Specifically, all of those claims turn upon the alleged unlawful arrest and use of excessive force.  Tollison makes no attempt to defend the IIED claim.  Having reviewed the relevant case law, the Court finds that the IIED claim cannot lie because the alleged conduct of Officer Hallau and Captain Lucas amounts to the commission of several traditional torts. Accordingly, summary judgment is warranted on this claim.

### 6.   Negligence Claims Against Officer Hallau and Captain Lucas

#### a.   *Breach of Duty*

Under Kentucky law, negligence normally requires proof of the following: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached the standard by which his or her duty is measured; and (3) consequent injury.   *Pathways, Inc. v. Hammons*,113 S.W.3d 85, 88 (Ky. 2003).   Generally "[t]he most important factor in determining whether a duty exists is foreseeability." *Id.* (quoting Liebson, 10.3).   "The actor is required to recognize that his conduct involves a risk of causing an invasion of another's interest if a reasonable man would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence, and judgment as a reasonable man would have."   *Id.* (quoting Restatement (Second) of Torts 289(a)).

However "[t]he obligation of a police officer in regard to individual citizens is not founded on foreseeability alone but rather upon the existence of a special relationship to the person likely to be injured." *Pile v. City of Brandenburg*, 215 S.W.3d 36, 40 (Ky. 2006). Two conditions must be satisfied in order to establish such a relationship: (1) the victim must have been in state custody or otherwise restrained by the state at the time the injury producing act occurred, and (2) the violence or other offensive conduct must have been committed by a state actor.   *Id.*

The distinction between ordinary negligence and gross negligence lies in the standard of care.   *Brotherton v. Victory Sports, Inc.*, 24 F. Supp. 3d 617, 620 (E.D. Ky. 2014) (stating that ordinary negligence is "the absence of ordinary care," while gross negligence is "the absence of slight care").   "[W]hile the courts of the Commonwealth have not always used precisely the same language in defining gross negligence, the prevailing

understanding defines gross negligence as a 'wanton or reckless disregard for the safety of other persons.'" *Kinney v. Butcher*, 131 S.W.3d 357, 359 (Ky. Ct. App. 2004) (noting that a jury need not find that the defendant "acted with express malice; rather it is possible that a certain course of conduct can be so outrageous that malice can be implied from the facts of the situation").

Negligent infliction of emotional distress is also "analyzed in accordance with common law negligence: (1) the defendant must have owed a duty of care to the plaintiff; (2) which it breached; (3) legally causing; (4) injury to the plaintiff." *Jackson v. Steele*, Civ. A. No. 11-72-DLB-EBA, 2014 WL 2801337, at *12 (E.D. Ky. June 19, 2014) (citing *Osbourne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012). The emotional distress must be "serious" or "severe," meaning that "emotional injury occurs where a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case." *Osbourne*, 399 S.W.3d at 18.

Officer Hallau and Captain Lucas do not dispute that they owed Tollison a duty of reasonable care. However, they argue that summary judgment is appropriate on these three claims, citing a lack of evidence in the record to suggest that they *breached* a legal duty owed to Tollison. In making this assertion, they again insist that they simply used reasonable force to effectuate an arrest supported by probable cause. Tollison again counters that Officer Hallau and Captain Lucas breached their duty to him by arresting him without probable cause and using excessive force to do so.

The viability of all three negligence claims hinges on one common element: Did Officer Hallau and Captain Lucas breach their duty to exercise reasonable care towards Tollison by using excessive force to effectuate an unlawful arrest? This inquiry cannot be

answered without first determining whether the arrest was lawful and whether the use of force was reasonable.  As the Court has already noted, reasonable minds could reach different conclusions as to these two sub-questions.  Because the lawfulness of the arrest and the reasonableness of the force are so closely tied to the question of breach, the Court must conclude that there are genuine issues of material fact on these negligence claims.

### b.    Qualified Immunity

"Under Kentucky law, public employees, including police officers, enjoy qualified official immunity from tort liability for 'good faith judgment calls made in a legally uncertain environment.'" *Woosley v. City of Paris*, 591 F. Supp. 2d 913 (E.D. Ky. 2008) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001).  Such immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision and judgment[;] (2) in good faith; and (3) within the scope of the employee's authority.'" *Yanero*, 65 S.W.3d at 522.  By contrast, "an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, i.e., one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.*

"A peace-officer's on -the-spot probable cause determination, as well as his decision whether to arrest, is an inherently discretionary act." *Caudill v. Stephens*, No. 2006-CA-0004770MR, 2007 WL 625348, at *1 (Ky. Ct. App. Mar. 2, 2007) (unpub.) (citing *Jeffers v. Heavrin*, 10 F.3d 380 (6th Cir. 1993)); *see also Lewis v. Meyers*, Civ. A. No. 5:09-CV-00156-R, 2010 WL 3829200, at *4 (W.D. Ky. Sept. 24, 2010).   Similarly, "[t]he

determination of the amount of force required to effect an arrest is a discretionary act." *Nichols v. Bourbon Cnty. Sheriff's Dept.*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014) (citing *Woosley*, 591 F. Supp. 2d at 922). Thus, Officer Hallau and Captain Lucas performed a discretionary act by deciding to arrest Tollison and apply minor restraining force.

Once an officer makes a prima facie showing that the act was within their discretionary authority, the burden shifts to the plaintiff to show that it was not performed in good faith. *Id.* at 523 (citing *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991)). The "good faith" requirement has objective and subjective components. *Id.* While the objective component focuses on a presumptive knowledge of and respect for "basic, unquestioned constitutional rights," the subjective component refers to "permissible intentions." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). Thus, "'bad faith' can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, i.e., objective unreasonableness; or if the officer or employee wilfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Yanero*, 65 S.W.3d at 523.

In conducting its § 1983 analysis, the Court has already considered whether Tollison had a clearly established right and whether someone in Officer Hallau and Captain Lucas' position presumptively would have known that such a right afforded to someone in Tollison's position. The Court found that Officer Hallau and Captain Lucas were entitled to qualified immunity on the § 1983 false arrest claim because there is no clearly established right to be free from arrest for inflammatory remarks to police officers. However, the Court decided that Officer Hallau and Captain Lucas were not entitled to

33

qualified immunity on the § 1983 excessive force claim because a non-resistant subject does have a clearly established right to be free from the use of force. To the extent that Tollison's negligence claims are predicated on an alleged lack of probable cause for arrest, Officer Hallau and Captain Lucas are entitled to qualified immunity under Kentucky law. However, they are not entitled to qualified immunity with respect to Tollison's negligence claims based on an alleged use of excessive force.[4]

> ### 8. Negligence Claims Against Chief Butler, Mayor Moriconi and the City Based on Deficient Hiring, Training and Supervision Practices

"Kentucky's recognition of torts based upon negligent hiring, negligent training, negligent supervision, and negligent retention is well established." *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 336 n. 10 (2014). As for negligent supervision, "Kentucky has adopted the Restatement (Second) of Agency 213 which illustrates the requirements for establishing a claim of negligent supervision." *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003). "[A]n employer may be held liable for negligent supervision only if he or she knew or had reason to know of the risk that the employment created." *Id.*

---

4) In his Amended Complaint, Tollison asserts that the City, IPD, Chief Butler and Mayor Moriconi are liable for each of the above-mentioned torts, intentional and negligence-based, on a *respondeat superior* theory. (Doc. # 23 at 19-28). Under this doctrine, an employer may be held liable for the tortious acts of an employee committed within the scope of his or her employment. *Patterson v. Blair*, 172 S.W.3d 361, 364-65 (Ky. 2005). This doctrine seems to apply to *Hughes v. City of Louisville*, Civ. A. No. 3:02-CV-60-S, 2007 WL 1035008, at *10 (W.D. Ky. Mar. 28, 2007) ("[U]nder Kentucky law, a municipality may be held liable for the actions of a police officer in making an unnecessary assault upon an individual in carrying out an arrest under a *respondeat superior* theory.") (citing *City of Lexington v. Yank*, 431 S.W.2d 892 (Ky. App. 1968)).

"Lliability under a theory of *respondeat superior* can only exist when there is an underlying tort." *Jackson v. Steele*, Civ. A. No. 11-CV-72-DLB-EBA, 2014 WL 2801337, at *13 (E.D. Ky. June 19, 2014) (citing *Patterson*, 172 S.W.3d at 363). Because the Court has granted summary judgment in favor of Officer Hallau and Captain Lucas on the malicious prosecution, abuse of process and IIED claims, it must also grant summary judgment in favor of the City, IPD, Chief Butler and Mayor Moriconi on a *respondeat superior* basis. However, the Court found that there were genuine issues of material fact precluding summary judgment on the other intentional tort and negligence claims. Because it is not yet clear whether Officer Hallau and Captain Lucas committed tortious conduct, it would be premature to grant summary judgment on the *respondeat superior* Defendants.

Chief Butler, Mayor Moriconi and the City move for summary judgment on this claim, relying on the lack of evidence in the record to suggest that they knew or had reason to know of a risk created by employing Officer Hallau and Captain Lucas.  Tollison maintains that they did know of such a risk vis a vis Officer Hallau.  After all, Chief Butler signed off on Officer Hallau's employee review in 2000, which referenced one verbal reprimand. (Doc. # 47-6).  It also stated that Officer Hallau's "emotions get the best of him at times and he should learn more control and patience." (*Id.*).  Tollison cites this as proof that Officer Hallau had "long-documented issues of working with the public." (Doc. # 46 at 35).

Tollison's argument fails for two reasons.  First, simply observing that Officer Hallau should be more patient does not automatically lead to the conclusion that he could not interact appropriately with the public.  Second, Tollison points to only one evaluation from fifteen years ago.  This is insufficient to establish any persistent issues with Officer Hallau's performance.  There being no other evidence in the record to suggest that Chief Butler, Mayor Moriconi and the City knew or had reason to know of a risk created by employing Officer Hallau or Captain Lucas, the Court finds that summary judgment is appropriate on this claim.[5]

### d.      Availability of Punitive Damages Against the City of Independence

"Judicial disinclination to award punitive damages against a municipality has persisted to the present day in the vast majority of jurisdictions." *City of Newport v. Fact*

---

5) The above analysis pertains solely to allegations of negligence on the part of the City, IPD, Mayor Moriconi and Chief Butler.  It does not dispose of the negligence claims asserted against the City, IPD, Mayor Moriconi and Chief Butler on a *respondeat superior* basis.  *See MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 337 (Ky. 2014) (stating that "a plaintiff may assert and pursue in the same action a claim against an employer based under *respondeat superior* based upon the agent's negligence, and a separate claim based upon the employer's own direct negligence in hiring, retention, supervision or training").

*Concerts, Inc.,* 453 U.S. 247, 260 (1981).  Thus, "[t]he general rule today is that no punitive damages are allowed [against a municipality] unless expressly authorized by statute."  *Id.*; *see also D.H. v. Matti*, Civ. A. No. , 2015 WL 4530419, at *8-9 (W.D. Ky. July 27, 2015) (noting that "the deterrent effect of punitive damages on municipal officials is limited and far outweighed by the cost to taxpayers").  Thus, "a municipality is immune from punitive damages under 42 U.S.C. § 1983."  *City of Newport*, 453 U.S. at 271.

Under Kentucky law, "[t]he amount of damages recoverable against a local government for death, personal injury or property damages arising out of a single accident or occurrence, or sequence of accidents or occurrences, shall not exceed the total damages suffered by plaintiff, reduced by the percentage of fault including contributory fault, attributed by the trier of fact to other parties, if any."  Ky. Rev. Stat. Ann. § 65.2002. Because "punitive damages serve to punish and deter," it stands to reason that "they exceed the 'total damages suffered by plaintiff.'"  *Matti*, 2015 4530419, at *10 (predicting that Kentucky courts would follow the general rule announced in *City of Newport*); *see also Louisville Metro Hous. Auth. v. Burns*, 198 S.W.3d 147, 151 (Ky. Ct. App. 2005) (describing KRS § 65.2002 as a "protection[ ] against punitive damage awards").

The Independence Defendants argue that Tollison cannot recover punitive damages from the City under § 1983 or Kentucky law.  Tollison does not respond to this argument. The Court having reviewed the relevant case law, it agrees that Tollison may not recover punitive damages against the City.

## IV.    Conclusion

Accordingly, **IT IS ORDERED** as follows:

(1)     Officer Hallau and Captain Lucas' Motion for Summary Judgment (Doc. # 38) is **GRANTED IN PART AND DENIED IN PART**;

(a)     The Motion is **GRANTED** as to **Count I** (§ 1983 unlawful arrest), **Count II** (§ 1983 unlawful detention/confinement), **Count IV** (§ 1983 conspiracy), **Count IX** (malicious prosecution), **Count X** (abuse of process) and **Count XI** (intentional infliction of emotional distress);

(b)     The Motion is **DENIED** as to **Count III** (§ 1983 excessive force), **Count VI** (assault), **Count VII** (battery), **Count VIII** (false imprisonment), **Count XII** (negligent infliction of emotional distress), **Count XIII** (negligence) and **Count XIV** (gross negligence);

(2)     Chief Butler and Mayor Moriconi's Motion for Summary Judgment (Doc. # 38) is **GRANTED IN PART AND DENIED IN PART**;

(a)     The Motion is **GRANTED** as to **Count V** (§ 1983 refusing or neglecting to prevent harm) and **Counts XII–XIV** (negligent hiring, training and supervision);

(b)     The Motion is **DENIED** as to **Count VI** (assault based on a *respondeat superior* theory), **Count VII** (battery based on a *respondeat superior* theory), **Count VIII** (false imprisonment based on a *respondeat superior* theory), **Count XII** (negligent infliction of emotional distress based on a *respondeat superior* theory), **Count XIII** (negligence based on a *respondeat superior* theory) and **Count XIV** (gross negligence on a *respondeat superior* theory);

(3)     The City and IPD's Motion for Summary Judgment (Doc. # 38) is **GRANTED IN PART AND DENIED IN PART**;

37

        (a)      The Motion is **GRANTED** as to **Count IV** (§ 1983 conspiracy), **Count V** (§ 1983 refusing or neglecting to prevent harm) and **Counts XII–XIV** (negligent hiring, training and supervision);

        (b)      The Motion is **DENIED** as to **Count VI** (assault based on a *respondeat superior* theory), **Count VII** (battery based on a *respondeat superior* theory), **Count VIII** (false imprisonment based on a *respondeat superior* theory), **Count XII** (negligent infliction of emotional distress based on a *respondeat superior* theory), **Count XIII** (negligence based on a *respondeat superior* theory) and **Count XIV** (gross negligence on a *respondeat superior* theory); and

        (4)      The parties to this action shall file a **Joint Notice** of available pre-trial and trial dates **within twenty (20) days of the date of entry of this Order**.

        This 25th day of September, 2015.



Signed By:

_David L. Bunning_  DB

**United States District Judge**

G:\DATA\Opinions\Covington\2013\13-55 Tollison MOO re MSJ.wpd